FILED
Apr 12 2024
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY     s/ A Cortez     DEPUTY

STEPTOE LLP
STEPHEN J. NEWMAN (SBN 181570)
2029 Century Park East, Suite 1800
Los Angeles, CA 90067
-     And -
KERRI A. LYMAN (SBN 241615)
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9400
Email:  snewman@steptoe.com
        klyman@steptoe.com

ARNALL GOLDEN GREGORY LLP
Darryl S. Laddin (pro hac forthcoming)
Georgia Bar No. 460793
Frank N. White (pro hac forthcoming)
Georgia Bar No. 753377
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Telephone:  (404) 873-8536
Email:  darryl.laddin@agg.com
        frank.white@agg.com

Attorneys for Plaintiff AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION**

| | |
|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., <br><br>            Plaintiff, <br><br> v. <br><br> PIRCH, INC. <br><br>            Defendant. | Case No.: **'24CV0672 TWR MMP** <br><br> **COMPLAINT FOR DAMAGES AND EMERGENCY INJUNCTIVE RELIEF** |

**COMPLAINT FOR DAMAGES AND EMERGENCY INJUNCTIVE RELIEF**

Plaintiff American Express Travel Related Services Company, Inc. ("**Amex**") respectfully submits its Complaint for Damages and Emergency Injunctive Relief against Defendant Pirch, Inc. ("**Pirch**"), showing the Court as follows:

### STATEMENT OF THE CASE

American Express brings this action to collect sums due from Pirch under the agreement between the parties, and to request emergency relief for protection of its customers, the public and to avoid possibly being defrauded with respect to losses – solely on American Express Card transactions – exceeding $33 Million. Pirch, a luxury kitchen and bathroom supplier based in Southern California that accepts American Express credit cards (among others) for payment, abruptly halted its business operations (with no explanation) in mid-March and has refused to engage in any meaningful communication for weeks. Consequently, customer disputes are piling up quickly and in exceptionally large volumes, and Amex is unable to meet its regulatory and contractual obligations to appropriately respond to over $30 Million in customer dispute claims, including determining what is legitimate, in whole, part, or not at all, because Pirch is inexplicably withholding transaction data and information that it is contractually obligated to provide to Amex under its Card Acceptance Agreement and the Merchant Regulations incorporated therein.

### THE PARTIES, JURISDICTION AND VENUE

1. Plaintiff Amex is a New York corporation with its principal place of business located at 200 Vesey Street, New York, NY 10285.

2. Defendant Pirch is a California corporation, with its principal office and place of business at 2714 Loker Avenue W., Suite 200-301, Carlsbad, California 92010.

3. Pirch is subject to personal jurisdiction in this Court by virtue of its corporate citizenship in the state of California. *See*, 28 U.S.C. § 1332(c).

4. Pirch can be served with process through its registered 1505 corporate

1 agent, InCorp Services, Inc., located at 5716 Corsa Avenue, Suite 110, Westlake Village, California 91362.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper in this Court because Pirch's headquarters and principal place of business in Carlsbad, California is located in this judicial district. While the applicable agreement between the parties, discussed below, provides for the Southern District of New York to be the venue for any action brought thereunder, that provision of the agreement was included for the benefit and convenience of Amex, at its insistence, and Amex hereby waives that forum selection requirement in the interest of justice, and in order to provide a more convenient and proximate forum for Pirch, which resides in this judicial district, and for the injunctive relief requested herein.

### FACTS COMMON TO ALL COUNTS

#### AMEX AND THE CHARGEBACK CYCLE

7. Amex is, among other things, and at all times relevant to this Complaint has been, a credit-card issuer as well as a processor of card payments, with the latter function also known in the vernacular of the payment systems industry as an "acquirer," such that is acquires merchants to accept the payment cards (credit and charge) issued by American Express. In its capacity as an acquirer, Amex serves as a "link" between merchants, such as Pirch (with which Amex has a contractual relationship), and "American Express"-branded credit cards issued by Amex or by its affiliated entity, American Express National Bank ("AENB"), thereby permitting those merchants to accept "American Express"-branded credit cards as a method of payment for purchases by the merchant's customers.

8. When a merchant such as Pirch receives an "American Express" credit card purchase from a customer (also known as a "cardmember" or "cardholder"), it

communicates the customer's card information to Amex. The "issuing bank" on the card (Amex or AENG, depending on the particular card type) the transmitted information to authorize the transaction on the customer's behalf. If the transaction is authorized, generally speaking, Amex pays Pirch the amount of the transaction, less certain fees or costs. The cardholder then is obligated to pay the transaction amount after issuance of a billing statement on the credit card account.

9. On occasion, however, a cardholder may be dissatisfied with his or her purchase from a merchant – *e.g.*, because the goods bought were defective or were never received - and may express this concern by first challenging the purchase with that merchant for a refund, and then, if that challenge is not addressed or resolved satisfactorily, by filing a dispute with Amex or AENB for that transaction. Amex then requires the merchant to provide it with sale/transaction/delivery data so that Amex can determine the validity (or invalidity) of the dispute. If the merchant fails to provide any data or support, the dispute may be decided in the cardholder's favor by default. When a cardholder's dispute is decided in its favor (i.e., permitted), the associated transaction charge is removed from its card statement as a credit adjustment. Amex then "reverses" the associated payment made to the merchant (known as a "chargeback"). Amex is then entitled – by contract – to recoup that chargeback from its merchant, which submitted the transaction for processing in the first instance, as provided in the card-acceptance contract between the parties; and the merchant is also contractually required to have funds available to satisfy any and all chargebacks so that American Express can be made whole after it refunds its card-using customers.

PIRCH AND THE AMERICAN EXPRESS CARD ACCEPTANCE AGREEMENT

10. Pirch entered into its Card Acceptance Agreement with Amex on or about May 28, 2008 (the "**Card Acceptance Agreement**" or "**CAA**"). A true and correct copy of the Card Acceptance Agreement, as subsequently amended, is attached hereto as **Exhibit A.**

11. Pursuant to the Card Acceptance Agreement, Amex agreed to process "American Express" credit card transactions initiated by Pirch's customers (the "**Services**").

12. In exchange for Amex's provision of the Services, Pirch agreed to pay Amex processing fees, as well as to indemnify Amex against, *inter alia*, customer chargebacks and any other expenses or losses associated with Pirch's processing activity. (*See* Card Acceptance Agreement at §§ 2(b)(i), 2(b)(ii) and 5(a).)

13. To resolve any disputes filed by Pirch's customers, Pirch is also required, under the Merchant Regulations that are expressly incorporated by reference into the Card Acceptance Agreement (*see* Card Acceptance Agreement at § 2(b)(ii)), to respond in writing, and to provide documentation needed in order to respond to a customer dispute, including any documentation in support of the charge (*i.e.*, to oppose the dispute) or to indicate that the dispute should be permitted in favor of the customer, resulting in a credit adjustment to the customer and a chargeback issued against Pirch.

14. The Card Acceptance Agreement between Pirch and Amex was in full force and effect at all times relevant to this action.

PIRCH'S ABRUPT "PAUSE OF BUSINESS"

AND EXORBITANT CHARGEBACKS

15. On or about March 20, 2024, and without any advance notice to Amex, Pirch suddenly ceased all business activity, closed all of its retail stores and issued a public statement on its website and social media indicating that it was temporarily implementing a "pause of business" in order to "give management the opportunity to complete a go-forward plan." Pirch has not processed any transactions with Amex since March 20, 2024.

16. Since that statement, there have been no further updates or public announcements by Pirch, and extensive efforts by Amex to contact Pirch and obtain urgently-needed information – including most recently a letter demanding the

required transaction and order fulfillment data sent on April 10, 2024 (attached hereto as **Exhibit B**) to which Amex has received no response as of the filing of this Complaint -- have been blatantly ignored, other than admitting in an e-mail that Pirch is "retaining all records.".

17. In the wake of Pirch's announcement, and likely motivated by the lack of explanation, updates or any transparency provided by Pirch thereafter, its customers immediately began disputing the charges on their American Express cards and seeking refunds issued by Amex and AENB (and other card issuers) in exceptionally large numbers.

18. As of the filing of this Complaint, over 1,800 customer disputes have been filed for over $33 Million in the aggregate on customer purchases with Pirch that were processed by Amex, which Amex may be forced to pay out-of-pocket because of Pirch's failure, malfeasance and/or refusal to perform its obligations under the Card Acceptance Agreement.

19. Indeed, because Pirch has shut its doors and stopped processing new transactions, Amex is unable to obtain any sale/transaction details to review and respond to the disputes and, ultimately, recoup the resulting chargebacks owed by Pirch from an ongoing flow of card settlement proceeds.

20. These circumstances also put Amex at significant regulatory risk. The consumer credit card industry is governed by laws and regulations requiring responses to certain customer disputes on a tight time frame. Pirch's failure to respond timely to Amex's information requests (as required by contract) makes it extraordinarily difficult for Amex to respond substantively to any customer disputes in short order. With respect to certain consumer disputes, the Consumer Financial Protection Bureau's "Regulation Z" implements the federal Fair Credit Billing Act and contains detailed requirements for the handling of such disputes. *See* 12 C.F.R. § 1026.13. Amex's contract with Pirch requires that, when such a dispute is received, Pirch must respond promptly with sufficient information to allow the

dispute to be handled in compliance with consumer protection law and consistent with sound and orderly business practices. Pirch's breach of contract through its failure to respond timely to Amex's information requests has harmed – and will continue to harm – Amex by impairing Amex's and AENB's ability to evaluate and respond to such disputes.

21. Despite repeated demands made upon Pirch , it has failed and refused to pay Amex for the unreimbursed chargebacks, or in fact to respond to or communicate with Amex in any substantive fashion. Thus, and just to date, Amex has effectively been left "holding the bag" for over $5 Million in chargebacks to date, and up to at least $33 Million in additional chargebacks requests initiated by Pirch's customers, for which Pirch previously received the sales transaction proceeds.

22. To make matters worse, and because no one at Pirch has communicated with Amex, it has no idea whether Pirch intends or even has the available inventory and capability to fulfill customer orders, or whether it even intends to respond to and oppose any of its customers' disputes. There also are indications of possible fraud by Pirch that need to be investigated, adding even more urgency for the need to protect the public and grant the relief that Amex is seeking.

23. In the meantime, Amex is accruing tens of millions of dollars in losses, with the utter lack of cooperation or communication from Pirch only exacerbating the situation and preventing Amex from engaging in any efforts to mitigate further chargeback losses by responding to customer disputes on Pirch's behalf, or to reverse the losses that it has incurred to date. These losses increase daily, and are currently running at a rate of approximately $1.6 million per day.

## AMEX FACES IRREPARABLE HARM

24. As a direct and proximate result of Pirch's conduct as described herein, Amex has suffered and will continue to suffer substantial harm and injury to its business.

25. Pirch's actions have unjustifiably prohibited Amex from adequately investigating and, where appropriate, challenging the dispute requests initiated by Pirch's customers (leading to unfunded chargebacks against Pirch), which continue to accrue to the tune of roughly $1.6 Million each day. Even worse, Pirch has been unjustly enriched at Amex's expense by receiving millions of dollars in payments for customer purchases, yet failing entirely to perform its corresponding obligations to Amex and its customers when they seek a refund on their purportedly unfulfilled purchase.

26. To be clear, Pirch—and only Pirch—possesses the inventory, sales and delivery data, and the customer terms and communications that would allow Amex to determine whether customer orders have been—or are capable of being—fulfilled in the wake of Pirch's abrupt decision to shutter its doors. Without that information—to which it is contractually entitled—Amex has been left with its hands tied behind its back, and no ability to respond to Pirch's customers, increasing regulatory risk (to timely and accurately decision the disputes), and possibly permitting by default disputes that are ineligible for relief (in whole or part) if Amex had received the transaction data to which it is absolutely entitled. Indeed, with such order data and inventory details, Amex could potentially assist in completing the purchase terms to its customers, thereby both benefiting the public at large and mitigating Amex's losses. (A completed, satisfactory delivery means there is no dispute and no chargeback, putting less resource strain on the court system.)

27. There also are signs that Pirch may have engaged in some kind of financial fraud that is ripe for inquiry and investigation, and may be careening towards an inevitable bankruptcy. Indeed, apart from its obligations to Amex, Pirch apparently owes millions of dollars to various other creditors, including various landlords and a supplier who recently sued the retailer for over $4 Million in unpaid inventory. Such facts typically do not emerge in this context without the possibility of significant financial and/or accounting fraud.

28. Amex's need to obtain delivery and order fulfillment data from Pirch is also exceptionally time sensitive. Not only have Pirch's customers already submitted dispute requests in exceptionally high volumes, but where a credit card purchase was made by a consumer, Amex typically has only a short period of time from submission of a charge dispute by the customer to provide an initial response (as little as 30 days in disputes submitted by consumer account holders) and, where appropriate, submit information indicating that the requested chargeback should not be allowed. Yet Pirch ceased all operation on March 20, 2024 – as of the filing of this Complaint, already 23 days ago. Consequently, any responses to the earliest of the disputes filed by consumer cardholders in the wake of Pirch's cessation of business will be time-barred within a matter of days from now, starting on April 19, 2024, with responses to additional batches of disputes becoming time-barred each day thereafter and at a rate running in approximately the mid- six figures each day. When a customer dispute is not timely responded to, a chargeback and refund are allowed in favor of the customer by default.

29. Unless Amex is granted injunctive relief so as to permit it to try to mitigate the damages caused by the sudden cessation of business by Pirch, the harm to the public and Amex's own business will be irreparable, as its additional losses will be vastly in excess of any sums that it might ever recover from an obviously insolvent merchant that is already facing collection actions by other significant creditors. Indeed, in situations like this, customers have been known to try to game the dispute process, obtaining refunds to which they are not rightfully entitled, and thus Amex needs the merchant information to prevent such inequitable behavior.

30. Moreover, the balance of equities and relative harms weighs heavily in favor of granting Amex's request for injunctive relief. Amex is seeking basic inventory, order fulfillment, delivery information, and customer communications that Pirch presumably maintained in the ordinary course of its operations and could easily produce. In fact, the information that Amex seeks now is not materially

different from the information that Pirch has always been contractually required to provide, and in fact has previously provided to Amex without incident or complaint, in connection with customer disputes submitted throughout the parties' over 15-year business relationship. And, as recently as April 2, 2024, Pirch has acknowledged that it is "retaining all records" relating to the chargeback requests. Amex is also seeking to satisfy its absolute federal and state regulatory obligations in a manner that is equitable to both customers and Amex.

31. On the other hand, if Pirch is not required to furnish such information, Amex faces *tens of millions* of dollars in potential chargeback exposure -- all resulting from Pirch's decision to cease operations -- without any ability to determine the validity of the customers' transaction disputes or attempt to mitigate its losses.

## COUNT I: BREACH OF THE CARD ACCEPTANCE AGREEMENT

32. Amex incorporates the preceding paragraphs of its pleading as if each was set forth fully herein.

33. The Card Acceptance Agreement is a valid and binding contract, supported by lawful consideration.

34. Amex has performed all material obligations it undertook to perform under the Card Acceptance Agreement, and all conditions precedent to the Card Acceptance Agreement's enforcement, if any, have been satisfied by Amex.

35. Pursuant to the Card Acceptance Agreement, Pirch agreed to reimburse and pay Amex for all chargebacks and refunds to customers, as well as processing fees associated with transactions submitted for processing by Pirch.

36. Notwithstanding that explicit agreement and undertaking, Pirch has failed and refused to respond to Amex for over $33 million in filed disputes to date (and at least $5 million in unreimbursed chargebacks, an amount that continues to grow daily), thereby breaching the Card Acceptance Agreement.

37. Pursuant to the Card Acceptance Agreement, Pirch also agreed timely

to provide Amex with information and documentation necessary to oppose or otherwise resolve any chargeback requests by Pirch's customers.

38. Despite its contractual obligation and repeated requests, however, Pirch has failed and refused to provide Amex with any information concerning its available inventory, its prior fulfillment of customer orders, its ability to fulfill pending customer orders that have been disputed or charged back, its intention to respond to and/or oppose any of its customers' disputes, or the status of its operations and any going-forward plans.

39. Amex has been directly and proximately damaged by virtue of the foregoing breach(es) of the Merchant Agreement in an amount to be proven at trial, but in no event less than $33 million as of the filing of this Complaint.

**COUNT II: ATTORNEYS' FEES**

40. Amex incorporates the preceding paragraphs of its pleading as if each was set forth fully herein.

41. Pursuant to section 2(c) of the Card Acceptance Agreement, Pirch agreed that Amex is entitled to recover "any costs incurred by [Amex] as a result of [Pirch's] failure to fulfill any obligations to [Amex], . . . or to Cardmembers, including attorneys' fees and our costs of handling Disputed Charges."

42. Pursuant to section 5(a) of the Card Acceptance Agreement, Pirch agreed to indemnify Amex "from and against all damages, liabilities, losses, costs, and expenses, including legal fees, in any respect arising or alleged to have arisen from: (i) [Pirch's] breach of the Agreement; . . . (iv) any transaction you submit or other use of [Amex's] services . . .; or (v) your provision of, or failure to provide, goods or services."

43. Due to the foregoing breaches of the Card Acceptance Agreement by Pirch, and its baseless and unexplained refusal to perform its obligations thereunder, Pirch has forced Amex to incur legal fees and collection costs arising out of the Services. Those costs, moreover, are continuing to accrue.

44. Thus, Amex is entitled to an award of reasonable attorneys' fees and collection costs from Pirch.

### COUNT III: INJUNCTIVE RELIEF

45. Amex incorporates the preceding paragraphs of its pleading as if each was set forth fully herein.

46. The Card Acceptance Agreement is a valid and binding contract, supported by lawful consideration.

47. Amex has performed all material obligations it undertook to perform under the Card Acceptance Agreement, and all conditions precedent to the Card Acceptance Agreement's enforcement, if any, have been satisfied by Amex.

48. Pursuant to the Card Acceptance Agreement, Pirch agreed timely to provide Amex with all necessary information and documentation necessary to oppose or otherwise resolve any chargeback requests by Pirch's customers.

49. Despite its contractual obligation and repeated requests, however, Pirch has failed and refused to provide Amex with any information whatsoever concerning its available inventory, its prior fulfillment of customer orders, its ability to fulfill pending customer orders that have been charged back to date, its intention to respond to and/or oppose any of its customer's disputes, or the status of its operations and any going-forward plans.

50. As a direct and proximate result of Pirch's conduct as described herein, Amex has suffered and will continue to suffer a probable harm or injury to its business.

51. Unless the Court grants injunctive relief that would permit Amex to try to mitigate the damages caused by Pirch, the harm to its business will be irreparable, as its additional losses will be vastly in excess of any sums that it might ever recover from Pirch. Granting this relief will also assist Amex to satisfy its state and federal regulatory obligations, and to help protect all customers from the damage caused by Pirch's misconduct and complete disregard of its obligations, as Amex can work

with other processors and card issuers to address their respective card holders' disputes and challenges.

52. Amex therefore seeks a temporary, preliminary, and permanent injunction ordering Pirch immediately to furnish Amex with data necessary to permit Amex to evaluate and, where appropriate, dispute customer chargeback requests, both submitted to date and going forward, including customer delivery and fulfillment data concerning, and any information indicating whether Pirch has sufficient inventory to fulfill and the intention and capability to fulfill, any customer orders that have been charged back or will be the subject of customer disputes from March 20, 2024 through the termination of this lawsuit.

53. The balance of equities clearly favors granting Amex's request for injunctive relief. Requiring Pirch to produce the requested information is an insignificant burden when compared to the harm facing Amex—covering Pirch's chargeback liability, caused by Pirch's own misconduct and malfeasance, without any way to limit Amex's exposure.

## PRAYER FOR RELIEF

WHEREFORE, Amex respectfully demands and prays that the Court enter judgement in favor of Amex and against Pirch and award to Amex:

(a) Actual damages in an amount to be determined at trial;

(b) A temporary, preliminary, and permanent injunction ordering Pirch to designate a corporate representative to immediately furnish Amex with documents and information necessary to permit Amex to evaluate and, where appropriate, oppose customer chargeback requests relating to transactions or orders placed with Pirch on or before March 20, 2024, as it is contractually required to do in the face of refund requests by its customers, and specifically including, in light of the exigent circumstances created by its own silence and inaction:

(i) Copies of Pirch's records of unfulfilled orders as of March 20,

2024;

  (ii) Confirmation of the amount of inventory reported on Pirch's latest balance sheet that is related to orders in which Pirch has already received a customer deposit and is storing inventory for the customer;

  (iii) Records reflecting delivery of any and all orders since November 22, 2022, including any orders that have been or will become the subject of refund or chargeback requests by Pirch's customers; and

  (iv) Any other information reasonably requested by Amex that relates to the status of Pirch's inventory and its ability or intention to fulfill and deliver the customer orders that are, or that become, the subject of chargeback requests from transactions or orders placed with Pirch on or before March 20, 2024;

(c) Attorneys' fees and court costs, as set forth above;

(d) Pre- and post-judgment interest at the maximum rate allowed by law; and

(e) Such other and further relief to which Amex may be entitled at law or in equity, including a pre-judgment writ of attachment.

Dated: April 12, 2024

Respectfully submitted,

*/s/ Kerri A. Lyman*
_____
Stephen J. Newman (SBN 181570)
Kerri A. Lyman (SBN 241615)
STEPTOE LLP
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9400
Email: snewman@steptoe.com
   klyman@steptoe.com

- And -

Darryl S. Laddin*
Georgia Bar No. 460793
Frank N. White*
Georgia Bar No. 753377
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8536
Email: darryl.laddin@agg.com
frank.white@agg.com

*Attorneys for Plaintiff American Express Travel Related Services Company, Inc.*

* Motion to appear *pro hac vice* forthcoming

COMPLAINT FOR DAMAGES AND EMERGENCY INJUNCTIVE RELIEF